**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>378 N. Main Avenue<br>Tucson, AZ 85701,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>BRIAN NESVIK, in his official capacity as Director of the U.S. Fish and Wildlife Service,<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>and DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior,<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>*Defendants*. | Case No. 26-cv-2912<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiff Center for Biological Diversity (the "Center") challenges the failure of the U.S. Fish and Wildlife Service (the "Service") to issue a final listing rule for the green floater mussel, in violation of the Endangered Species Act's ("ESA" or "Act") nondiscretionary, congressionally mandated deadline. The Service's failure to meet the ESA deadline for the green floater delays lifesaving protections for the mussel, increasing its risk of extinction.

2. Plaintiff brings this lawsuit for declaratory and injunctive relief, seeking an Order declaring that the Service violated Section 4(b)(6)(A) of the ESA, 16 U.S.C. § 1533(b)(6)(A), by

failing to issue a timely final listing rule and critical habitat designation for the green floater and directing the Service to issue the final rule by a date certain.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c), (g) (ESA citizen suit provision) and 28 U.S.C. § 1331 (federal question).

4. This Court has authority to issue declaratory and injunctive relief pursuant to the ESA, 16 U.S.C. § 1540(g); the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and the Administrative Procedure Act, 5 U.S.C. § 706(2).

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because Defendants' personal place of business is in this judicial district.

## PARTIES

6. Plaintiff the CENTER FOR BIOLOGICAL DIVERSITY is a national non-profit conservation organization that works through science, law, and policy to protect imperiled wildlife and their habitat, including the green floater. The Center is headquartered in Tucson, Arizona, with offices throughout the United States and has more than 101,000 active members throughout the country.

7. The Center brings this action on behalf of its staff and members who derive recreational, educational, scientific, professional, and other benefits from the green floater and its habitat. Plaintiff's members' interests in protecting and recovering this species of mussel and its habitat are directly harmed by the Service's failure to issue a timely final rule, delaying critical protections under the ESA that would put the green floater on a path to recovery.

8. For example, Center member Ed Gertler is a resident of Silver Spring, Maryland and is retired after a 43-year career with the Maryland Department of the Environment. Mr.

Gertler is also an accomplished river paddler and has authored four comprehensive guidebooks describing the recreationally navigable waterways of Pennsylvania, New Jersey, Maryland, Washington D.C., Delaware, and Virginia. For as long as he can remember, Mr. Gertler has been passionate about exploring rivers. Since the early 1970s, Mr. Gertler has paddled stretches of the upper Potomac River and lower Conococheague Creek, areas where the green floater mussel is known to occur and where critical habitat for the species has been proposed. Mr. Gertler has kept detailed records of his visits to these river stretches since 1973. Between 1973 and 2017, he paddled the upper Potomac River and lower Conococheague Creek near Williamsport, Maryland, on at least nine occasions. Over these 44 years, he documented each journey, noting weather conditions, wildlife sightings, river characteristics such as flow and turbidity, obstacles or debris, and human influences such as traffic, bridges, boat launches and ramps, and signs of pollution or development. Mr. Gertler's enjoyment of these waterways is enhanced by knowing they support rare native species such as the green floater and by the opportunity to visit, experience, and appreciate the aquatic habitats on which the species depends. Through both his professional background in environmental protection and decades of firsthand experience on these rivers, Mr. Gertler understands that the green floater is an indicator of healthy, functioning ecosystems and that its continued presence reflects clean water and ecological integrity that he values while paddling. He enjoys observing and appreciating the natural features and wildlife communities associated with green floater habitat, including fish and birds that depend on the same high-quality river conditions. Mr. Gertler plans to return to these stretches of proposed critical habitat within the Potomac Watershed on an annual basis. He enjoys re-running river sections to observe changing conditions, which helps inform the guidebooks he writes. Mr. Gertler's personal passion for paddling intersects with his professional background and long-

standing connection to this watershed. Like all paddlers, he values clean water and healthy river ecosystems. While his paddling goals have evolved over the years, Mr. Gertler treasures any time he gets to spend on the river. He finds polluted water offensive and views water contamination a serious threat to his wellbeing, particularly noting the enhanced risks when sewage treatment plants are overwhelmed. The Service's failure to finalize ESA protections for the green floater and to timely designate over 205 river miles of critical habitat within the Potomac Watershed in Pennsylvania, Maryland, and West Virginia harms Mr. Gertler's recreational and aesthetic interests by increasing the risk of further degradation of the rivers and streams he regularly visits and intends to revisit. Those failures diminish his ability to enjoy and appreciate the waters that support the green floater and unique ecological values that the species represents. They also reduce the likelihood that the green floater will persist and recover in its current range, depriving Mr. Gertler of the opportunity to experience and take satisfaction in the continued existence of this rare, native mussel in the waterways he has explored and documented for decades.

9. The Service's violation of the ESA's deadline has delayed ESA protections for the green floater. This inaction harms the Center's members' —including Mr. Gertler's—interests in the green floater as the Service simply stands by while the mussel faces local extirpation and extinction, decreasing the likelihood that the Center's members will encounter the species as part of their personal and professional excursions. These injuries are actual, concrete injuries presently suffered by the Center's members, are directly caused by Defendants' acts and omissions, and will continue unless the Court grants relief. The relief sought would redress these injuries by providing ESA protection for the green floater and promoting its conservation and recovery. The Center and its members have no other adequate remedy at law.

10. Defendant U.S. FISH AND WILDLIFE SERVICE is the agency within the Department of the Interior charged with implementing the ESA for the green floater. The Secretary of the Interior has delegated administration of the ESA to the Service. 50 C.F.R. § 402.01(b).

11. Defendant BRIAN NESVIK is the Director of the Service and is charged with ensuring that agency decisions comply with the ESA. Defendant Nesvik is sued in his official capacity.

12. Defendant DOUG BURGUM is the Secretary of the U.S. Department of the Interior ("Secretary") and has the ultimate responsibility to administer and implement the provisions of the ESA and to comply with all other federal laws applicable to the U.S. Department of the Interior. Defendant Burgum is sued in his official capacity.

## STATUTORY FRAMEWORK

13. The Endangered Species Act, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA's primary purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

14. The Act directs the Secretary of the Interior, through the Service, to determine which species of plants and animals are "endangered" and "threatened" and place them on the list of protected species—otherwise known as "listing" a species. *Id.* § 1533.

15. The Secretary has delegated its administration of the Act to the Service for freshwater aquatic species, including the green floater. 50 C.F.R. § 402.01(b).

16. ESA Section 4 requires the Service to protect imperiled species by listing them as "endangered" or "threatened." 16 U.S.C. § 1533(a)(1). A species is "endangered" when it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

17. The ESA defines "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

18. The ESA requires the Service to determine whether any species is endangered or threatened because of any one of, or combination of, the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id.* § 1533(a)(1).

19. The Service must list a species if the species meets the definition of "endangered" or "threatened" due to "any one or a combination of" these five listing factors. 50 C.F.R. § 424.11(c); *see* 16 U.S.C. § 1533(a)(1).

20. If the Service determines that the species is not endangered throughout all its range, the ESA requires the agency to examine whether it is endangered or threatened throughout any "significant portion" of its range. *Id.* §§ 1532(6), (20).

21. The Service must base all listing determinations "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

22. The ESA allows any interested person to formally petition the Service to list a species as endangered or threatened. *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

23. To ensure the timely protection of species at risk of extinction, Congress set forth a detailed process whereby interested persons may petition the Service to list a species as endangered or threatened. 16 U.S.C. § 1533(b)(3). In response, the Service must publish a series of three decisions according to statutory deadlines.

24. First, within 90 days of receipt of a listing petition, the Service must, "to the maximum extent practicable," publish an initial finding as to whether the petition, "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A). This is known as the "90-day finding." If the Service determines in the 90-day finding that the petition does not present substantial information indicating that listing may be warranted, the petition is rejected, and the process concludes.

25. If the Service determines in the 90-day finding that a petition presents substantial information indicating that listing "may be warranted," the Service must publish that finding and proceed with a scientific review of the species' status, known as a "status review." *Id.*

26. Upon completing the status review, and within 12 months of receiving the petition, the Service must publish a "12-month finding" with one of three listing determinations: (1) listing is "warranted"; (2) listing is "not warranted"; or (3) listing is "warranted but precluded" by other proposals for listing species, provided certain circumstances are met. *Id.* § 1533(b)(3)(B).

27. If the Service determines that listing is "warranted," the agency must publish that finding in the Federal Register along with the text of a proposed regulation to list the species as endangered or threatened and to designate critical habitat for the species. *Id.* § 1533(a)(3)(A),

(b)(3)(B)(ii). Within one year of publication of the proposed listing rule, the Service must publish in the Federal Register the final rule implementing its determination to list the species and designate critical habitat. *Id.* § 1533(b)(6)(A).

28. Once a species is listed, the Act provides both procedural and substantive protections to ensure not only the species' continued survival, but also its ultimate recovery. For example, Section 4(a)(3) of the Act requires the Service to designate "critical habitat" for each endangered and threatened species and to develop and implement recovery plans. *Id.* §§ 1533(a)(3), (f); 1532(5). Other provisions authorize the Service to acquire land for the protection of listed species, *id.* § 1534, to make federal funds available to states to assist in the conservation of endangered and threatened species, *id.* § 1535(d).

29. In addition, ESA Section 7(a)(2) requires all federal agencies to consult with the Service to ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2).

30. ESA Section 9 makes it unlawful to "take" any endangered species, which means no person can "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" an endangered species without first receiving authorization from the Service. *Id.* §§ 1532(19) (defining "take"), 1538.

31. Thus, listing a species as endangered or threatened is the crucial first step in the ESA's system of species conservation and recovery.

## FACTUAL BACKGROUND

**The Green Floater**



*Photo Credit: Ryan Hagerty/USFWS*

32. The green floater (*Lasmigona subviridis,* pictured above) is a small freshwater mussel species historically found in rivers and streams across ten states in the Mid-Atlantic and Southeast United States. This species has a relatively short lifespan and uses a unique reproductive strategy that does not require a fish host, unlike the majority of freshwater mussels.

33. The green floater is a long-term brooder, fertilizing its eggs in the summer, holding larvae in their gills over winter, and releasing juveniles in the spring. Green floaters are intolerant of very strong currents and are often found in quiet pools and eddies with gravel and sand substrate. These traits, along with its need for well-oxygenated water and suitable temperatures, make the green floater particularly vulnerable to habitat disturbances.

34. Freshwater mussels are known as the "liver of the river" because they filter toxins and other pollutants out of water and reduce turbidity by removing algae, sediment, and other harmful substances. Freshwater mussels can filter out pharmaceuticals, personal care products, herbicides, flame retardants, *E. coli*, and avian influenza. A single mussel can filter up to 15 gallons of water each day. Despite their ecological importance, freshwater mussels are among

the most endangered taxa in the world: of the 300 distinct freshwater mussel species in North America, 70% are endangered, imperiled, or extinct. The green floater is one of these 70%.

35. The green floater faces the possibility of local extirpation and extinction from a multitude of threats. Like most freshwater mussels, this species is highly sensitive to water quality degradation, including pollutants such as chlorine, ammonia, copper, fungicides, and herbicide surfactants. Sedimentation is another threat to the green floater; fine sediments can contain toxic contaminants and alter streambed habitat, impairing feeding, reproduction, and overall survival. Because mussels are among the most sensitive aquatic organisms, even minor contaminant increases above background concentrations could impair local green floater populations' growth, reproduction, and survival outcomes.

36. The green floater will continue to face decline from the aforementioned threats and increases in developed land use. The Service's Species Status Assessment projected that by 2060, around 97 percent of green floater analysis units would have a greater than 50 percent probability of being in what is known as "low condition" or extirpated. Very few populations of green floaters will have resilience to random, or stochastic, events, making their vulnerability to extirpation even greater, especially given that these mussels tend to occur in smaller populations compared to other freshwater mussel species.

37. The green floater requires urgent protection at the federal level, as it is currently threatened by habitat loss and fragmentation, degraded water quality and alterations in water flows, and faces compounded impacts from climate change, affecting its ability to survive and reproduce.

**<u>The Center's Listing Petition and the Service's Response</u>**

38. On April 20, 2010, the Center, along with other conservation partners, petitioned the Service to list the green floater under the ESA. The petition identified the green floater's historic range, habitat preferences, ecology, population status and trends, and factors affecting the species' survival. The petition explained that a main threat to the green floater's remaining populations was habitat destruction due to agricultural and development activities in the riparian zone. Other identified threats included flow alterations from impoundment and waterway diversion, and increased siltation.

39. On September 27, 2011, the Service published a partial 90-day finding, concluding that the Center's 2010 petition provided substantial scientific information that may warrant the green floater mussel's listing. *See* 76 Fed. Reg. 59836, 59859 (Sept. 27, 2011).

40. On July 26, 2023, more than a decade after its partial 90-day finding, the Service published a 12-month finding and proposed to list the green floater as a threatened species under the ESA based on a review of the best available scientific and commercial information. *See* 88 Fed. Reg. 48294 (Jul. 26, 2023). The Service also proposed to designate eight units as critical habitat for green floater, including 1,586 river miles across Maryland, New York, North Carolina, Pennsylvania, Virginia, and West Virginia. *See id.* at 48316.

41. The deadline for the Service to issue a final listing rule and designate critical habitat was one year from the proposed rule, or by July 26, 2024. The deadline for publishing the final listing rule has since passed. At present, the Service has neither published a final rule to list the green floater as a threatened species nor to designate its critical habitat.

42. The Center provided Defendants with 60-days' notice of their ESA violations, as required by 16 U.S.C. § 1540(g)(2)(C), by a letter to the Service that the Service received on May 19, 2026, more than 60 days prior to the filing of this complaint.

43. Since receiving the Center's notice letter, the Service has not advanced the green floater's listing in any substantive way.

44. Because Defendants have not remedied the violations set out in the notice letter, an actual controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

## CLAIM FOR RELIEF

### Violation of the ESA for Failure to Issue a Final Listing Rule for the Green Floater

45. Plaintiff re-alleges and incorporates all allegations set forth in the preceding paragraphs.

46. Within one year of the proposed listing rule, the ESA requires the Service to publish a final rule implenting its determination or notice that the one-year deadline is being extended. 16 U.S.C. § 1533(b)(6)(A).

47. In response to the Center's petition to list the green floater, the Service proposed to list the green floater as a threatened species on July 26, 2023, and thus the final listing rule was due on July 26, 2024.

48. The Service has yet to finalize and publish the statutorily required final listing rule for the green floater.

49. Defendants have failed to perform their nondiscretionary duty to timely issue a final listing rule in violation of the ESA. 16 U.S.C. § 1533(b)(6)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1. Declare that Defendants violated the ESA by failing to issue a timely final listing rule in response to the Center's petition to list the green floater under the ESA;
2. Provide injunctive relief compelling Defendants to issue the final rule by a date certain;
3. Retain continuing jurisdiction to review Defendants' compliance with all judgments and orders herein;
4. Grant Plaintiff its reasonable attorneys' fees and costs as provided by the ESA, 16 U.S.C. § 1540(g)(4); and
5. Provide such other and further relief as the Court deems just and proper.

Respectfully submitted and dated this 19th day of August 2026.

*/s/ Daniel Waltz*
Daniel Waltz (DDC Bar No. D00424)
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (303) 880-9136
Fax: (520) 623-9797
dwaltz@biologicaldiversity.org

Lindsay Reeves (LA Bar No. 32703)
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115
Tel.: (504) 342-4337
lreeves@biologicaldiversity.org
*Pro Hac Vice Admission Pending*

Laurel Jobe (TN BPR No. 043563)
Center for Biological Diversity
P.O. Box 4268
Chattanooga, TN 37405
Tel.: (423) 441-8558
ljobe@biologicaldiversity.org
*Pro Hac Vice Admission Pending*

*Attorneys for Plaintiff*